McMILLAN and another, Administrators, Appellants, vs.
HOLLEY and others, imp., Respondents.

*February 2—March 14, 1911.*

*Trusts: Construction of agreement with creditors: Implied direction
as to surplus: Evidence: Parol proof of extrinsic facts.*

1. Where a trust agreement providing for a conveyance of property
for the payment of debts of the grantors, but containing no ex-
press provision for the return to them of any surplus, left it
doubtful what the intent of the grantors was in that regard, it
was proper to receive and consider extrinsic evidence as to the
facts and circumstances surrounding the parties at the time of
its execution in order to arrive at its proper construction.

2. Where such agreement on the one hand recited that the grantors
had "ample property" to pay their debts if it were not sacrificed,
mentioned the "services of the trustees" as part of the consid-
eration of the transfer, directed that the trustees continue the
business until a certain date "unless the debts be sooner paid,"
provided for an annuity to be paid one of the grantors during
the closing of the estate, and in the certificate of acknowledg-
ment referred to the trustees as "trustees for the said parties
and their creditors;" but on the other hand called said trustees
in the body of the agreement "trustees for the creditors," ab-
solutely discharged the personal liability of the debtors in con-
sideration of the transfer, provided for calling a meeting of
creditors to "realize and divide the estate," and required that the
books and accounts of the trustees should be at all times open
to creditors, not mentioning the debtors, it is *held*, upon ex-
trinsic proof showing that no surplus was anticipated by at least
one of the debtors at the time of making the agreement, and
that both had considered the subject of providing in the agree-
ment for the disposal of any surplus but omitted it from the
final draft, that the trial court properly found the conveyance
to be absolute for the benefit of the creditors alone, and that
there was no trust for the grantors.

3. In such case the trustees having, for lack of purchasers, conveyed
the residuum of the property to a corporation organized by the
creditors for the purpose of taking title thereto, neither the
trustees nor such corporation was under obligation to account
to the debtors in respect to the property so conveyed, although
by the return of better times and the general improvement of
business it increased largely in value.

APPEAL from a judgment of the circuit court for La Crosse county: JAMES O'NEILL, Judge.  *Affirmed.*

This is an action in equity brought by the administrators of the estate of Alexander McMillan to charge the defendants *John M. Holley, E. C. Warner,* and one W. W. Cargill (now deceased) as trustees for the plaintiffs, to compel an accounting of the trust property, and to set aside conveyances made by said defendants to the *McMillan Company,* a corporation, which is also joined as a defendant.   The answer denied the existence of any trust.   The action was referred to C. L. Baldwin, Esq., to hear, try, and determine.   The facts were not seriously disputed.

Prior to December, 1896, the firm of D. D. McMillan & Sons, composed of D. D. McMillan, John H. McMillan and William McMillan, owned and operated a number of elevators in Texas.   Alexander McMillan owned considerable real property in La Crosse and elsewhere.   Both Alexander and the firm were largely in debt, Alexander's individual indebtedness being mostly secured by mortgages upon real estate. He had also indorsed the notes of D. D. McMillan & Sons to a large amount, and the total indebtedness, secured and unsecured, amounted to about $190,000.   In November, 1898, the parties were unable to proceed in business, and after some negotiation entered into an agreement with all of their creditors by which they turned over all of their property to *Holley, Warner,* and Cargill as trustees, which agreement, after the preliminary clause, reads as follows:

"Whereas, the said firm of D. D. McMillan & Sons is largely indebted in various amounts at this time to certain of said several creditors, and said D. D. McMillan and Alexander McMillan are indebted to others of said several creditors, and have also become contingently liable by indorsement and guarantee for debts of said D. D. McMillan & Sons, and said firm as principal debtor and said D. D. McMillan and said Alexander McMillan as principal debtors, and as indorsers and guarantors, as aforesaid, are not able at this time

to pay and discharge the demands of said creditors, *but have ample stock in trade, property and effects for that purpose if the same can be converted without sacrifice, and it is believed that said debts can be paid if the business of said firm can be continued with free use of the property and resources now in the hands of said firm, in the manner hereinafter provided.* Now this agreement witnesseth that in consideration of the forbearance of suit by each of the creditors, *and the release on their part hereinafter contained and of the services to be performed by said trustees as hereinafter set forth,* the said firm of D. D. McMillan & Sons and each and every member of said firm hereby assigns and transfers in trust to said trustees all personal estate of every kind and nature, and all notes, claims, demands, book accounts, and effects of every name and description belonging to said firm wherever situated, and the business, name and good will of said firm, and authorize and empower them. forthwith upon and after the execution of this agreement to take possession of all such personal property, effects and business *and to continue said business under their own names as trustees for said creditors for the length of time and subject to the conditions hereinafter set forth,* and for the same considerations aforesaid, said firm of D. D. McMillan & Sons will forthwith upon and after the execution of this agreement convey to said trustees upon the same trusts all real estate and interest in real estate wherever situate belonging to and used by said firm whether held in the name of said firm or in the name of any member thereof, and for the same considerations aforesaid, said D. D. McMillan will forthwith upon and after the execution of this agreement convey and transfer to said trustees upon the same trusts all the following described real estate and personal property:

[Description of property.]

"D. D. McMillan & Sons' property:

[Description of property.]

"And for the same consideration aforesaid said Alexander McMillan will forthwith upon and after the execution of this agreement, convey and transfer to said trustees, upon the same trusts, all the following described real estate and personal property:

[Description of property.]

"It is expressly understood and agreed that this agreement

:shall ·be of no force and effect unless said conveyances and
transfers from said firm and from D. D. McMillan and Alex-
ander McMillan shall be fully executed and delivered to said
.trustees on or before the 10th day of January, 1897.

"*Said trustees shall hold, manage and control all of said
real and personal property so to be conveyed and transferred
to them with power to lease said real estate and collect and em-
ploy rents as hereinafter provided, and shall continue the busi-
ness heretofore carried on by the said firm of D. D. McMillan
& Sons until the first day of January, A. D. 1900,* unless the
·debts of said firm shall be sooner fully paid, or unless the said
trust shall be sooner terminated in the manner hereinafter
;provided.   They shall keep said property in good condition
·and repairs, keep all insurable portions thereof insured
against fire or other damage to the extent, at least, that the
same is now insured, or more in their discretion, distribute
and pay over the net profits of said business and net proceeds
of rents and all other income from said property and business
among and to said creditors *pro rata* according to the amounts
·of their several demands, *and in fixing the amount of said
several demands for purposes of such distribution they shall
add to the face of each claim the interest thereon accrued and
unpaid up to January 1st, 1897;* and it is expressly under-
.stood that such *pro rata* payments of net proceeds shall be ap-
plied in extinguishment of interest accrued up to the date of
·each payment, and in case of deficiency in the amount to pay
all accrued interest, interest accrued upon any indebtedness
secured by mortgage, pledge or hypothecation now in force,
shall be first paid in full, and if there should be any deficiency
in the amount required to pay such mortgage interest, pay-
ments shall be made on account of interest upon secured in-
·debtedness *pro rata* according to the several principal amounts.

"*And it is further hereby agreed and declared, that if at
any time prior to said first day of January, 1900,* the said
·trustees shall be of the opinion that having regard to the con-
·dition and prospect of the business of said debtors so contin-
ued by them it would be expedient forthwith to wind up the
·same and realize *and divide the estate,* they shall call a meet-
ing of said creditors by circular letter, stating the time, place
and object of the meeting, and sent by post or otherwise to the
.last known place of abode or business of such creditors, re-

spectively, or their respective agents, in time to give to said creditors or agents fifteen clear days' notice of such meeting; and if at such meeting a majority in number representing three fourths in value of the creditors present or represented at the meeting shall resolve that the said business and estate be wound up and realized, then the trustees shall, with all convenient speed, proceed to wind up the said business, and to sell, collect, and realize the said estate, and apply the net proceeds thereof first in the payment of all debts secured by mortgage in the order of legal preference, *and the remainder pro rata as aforesaid upon unsecured claims. If all the said debts shall not have been fully paid on or before January 1st, 1900,* and the said creditors shall not on or before that date have consented in writing to a further extension of said trust and continuance of said business in the manner and for the purpose herein provided, it shall then be the duty of the said trustees to proceed as aforesaid to wind up the said business and to sell, collect and realize said estate and apply the *net proceeds as hereinbefore provided,* and all provisions of this agreement as to control and management and power of sale of and over all the property of said estates shall be continued in force for such length of time after January 1st, 1900, as may be necessary for the purpose of winding up the estate. *Full power and authority is given hereby to said trustees in their discretion to sell and dispose of any of the property, real or personal, conveyed and to be conveyed to them pursuant to the provisions hereof, which in their opinion is not necessary or useful in the further prosecution of the business, and to use and apply the net proceeds thereof* in the same manner hereinbefore provided for the use and application of the net profits of said business, and *in consideration of the premises the creditors hereby respectively release said debtors, their heirs, executors and administrators from the said debts due to them respectively, and from all liability as indorsers or guarantors, and from all actions, proceedings, claims and demands in respect thereof.* Provided, however, and it is hereby agreed and declared, that these presents, and the release hereinbefore contained, shall not in any wise prejudice or affect the rights or remedies of any of the said creditors against any surety or sureties other than said Alexander McMillan and D. D. McMillan, or any person or persons other than the debt-

ors, their heirs, executors or administrators, and that no pledges, mortgage or hypothecation of any of the property hereinbefore mentioned as conveyed and transferred, or to be conveyed and transferred to said trustees shall be deemed to be released or discharged, or in any manner impaired, except by payment in full of the indebtedness secured by said pledge, mortgage, or hypothecation; and at and after the time of the termination of the trust herein provided for or of any agreed extensions thereof or of its termination by vote of three fourths in value of the creditors as hereinbefore provided for, the holder of any such pledge, mortgage or hypothecation may proceed to enforce the same for any then unpaid portion of the indebtedness secured thereby.    And it is further agreed that the books and papers of said business to be continued by said trustees and all books and accounts of and relating to the management of said entire trust estate shall be open at all times in proper business hours to examination by any of said creditors, or by any committee whom they may appoint for that purpose.

"In consideration of the fact that said Alexander McMillan is only liable contingently and as an indorser for the indebtedness of said firm of D. D. McMillan & Sons and that this agreement provides for the conveyance to said trustees of all the productive property of said Alexander McMillan, *it is hereby further agreed that said trustees shall and may pay over from time to time to said Alexander McMillan out of the proceeds of rentals or other income derived from the property conveyed by said Alexander McMillan pursuant hereto a sum or sums not exceeding in the aggregate two thousand dollars ($2,000) per annum.*

"A majority of said trustees shall have power to do any act required to be done in the execution of this trust."

This agreement was duly signed, sealed, and acknowledged by the grantors, the trustees, and the creditors.

In January, 1897, the trustees took possession of all of the property and commenced its administration.    They sold the Texas elevators and some other property and made payments upon the claims.    In September, 1897, they were threatened with suit by the receiver of the National Bank of Illinois,

which had a claim of $10,000 face value, and the trustees pur-
chased the claim for one third of its face, each trustee furnish-
ing $1,111.11, and taking an assignment of one third of the
claim.     March 1, 1900, the outstanding unsecured claims
with interest amounted to more than $62,000, held by eight
claimants, three of whom were the trustees and held the fol-
lowing amounts, respectively: State Bank of La Crosse (rep-
resented by *John M. Holley*), $18,200; W. W. Cargill,
$13,100; and *E. C. Warner,* $13,500.     The balance was held
in smaller sums by five other claimants.     There were also
notes outstanding given by the trustees to pay off mortgages
and to defray operating expenses of $19,500, unpaid bills for
expenses of $2,153.65, and a mortgage indebtedness on the
McMillan building in La Crosse of $25,000, making a total
of $109,103.65.     The property then left in the hands of the
trustees consisted almost entirely of real estate which had
been owned by Alexander McMillan in the city of La Crosse,
including the McMillan building, together with some acreage
property at St. Paul, Minnesota, and it was arbitrarily valued
at $109,103.65 in order to equal the total claims.     The
trustees then attempted to dispose of the property and close
out the trust, but after advertising in the newspapers and em-
ploying real-estate men for some time without success they
concluded that the best and perhaps the only feasible way to
close out the matter was for the creditors or claimants re-
maining to form a corporation capitalized at $62,000, and
each claimant to take stock to the amount of his claim and
then transfer the remaining property to the corporation.
The claimants all agreed to this plan, and a corporation called
the *McMillan Company* (one of the defendants) was formed
and the plan carried out.     Under the view taken of the case
by the court it is unnecessary to go into the facts subsequently
occurring.

The referee found that the trust agreement created not
merely a trust for the creditors but a trust for the grantors, in

that in legal effect it provided that in case the debts were fully paid at any time the residuum was to be returned to the grantors.   Hence he concluded that the trustees could not convey the property to the *McMillan Company,* of which they owned a large majority of the stock, and that such conveyance must be set aside and an accounting must be had to ascertain whether or not there was any surplus of property in the hands of the trustees after the payment of the claims.   The circuit court, however, came to the conclusion that the agreement in question created no trust in favor of the grantors, but was an absolute conveyance in favor of the creditors; that the sale to the *McMillan Company* was a valid sale; and that the plaintiffs were barred from relief in any event by laches and acquiescence.   The complaint was thereupon dismissed on the merits, and the plaintiffs appeal.

For the appellants there was a brief signed by *A. E. Bleekman* and *Bunge & Bosshard,* and oral argument by *George W. Bunge* and *A. E. Bleekman.*   They contended, *inter alia,* that in trusts for the payment of debts there is always an implied direction to the trustee to return any surplus, and defendants were liable to account.   *Farnsworth v. Doom,* 22 Ky. Law Rep. 1491, 60 S. W. 712; *Atwater v. Manchester Sav. Bank,* 45 Minn. 341, 12 L. R. A. 741; *Quimby v. Uhl,* 130 Mich. 198, 89 N. W. 722; *Geisse v. Beall,* 3 Wis. 367; *Nodine v. Wright,* 37 Oreg. 411, 61 Pac. 734.   The sale to the *McMillan Company* was in fact to the trustees themselves, and void at plaintiffs' election.   *Harrigan v. Gilchrist,* 121 Wis. 127, 363, 99 N. W. 909; *Rowell v. Rowell,* 122 Wis. 1, 13, 99 N. W. 473; *King v. Remington,* 36 Minn. 15, 29 N. W. 352; *Frazier v. Jeakins,* 64 Kan. 615, 57 L. R. A. 578; *Cook v. Berlin W. M. Co.* 43 Wis. 433; *Wing v. Hartupee,* 122 Fed. 897, 900; *Munson v. S., G. & C. R. Co.* 103 N. Y. 58, 74; *Ludington v. Patton,* 111 Wis. 208, 86 N. W. 571; *Hayes v. Hall,* 188 Mass. 510, 74 N. E. 935; *Michoud v. Girod,* 4 How. (45 U. S.) 503.

For the respondents there was a brief by *Woodward & Lees,* and oral argument by *G. M. Woodward.* They cited, among other cases, *Nevius v. Nevius,* 117 App. Div. 236, 101 N. Y. Supp. 1091; *Selden v. Vermilya,* 3 N. Y. 525; *Cooke v. Smith,* L. R. 45 Ch. Div. 38, 1 App. Cas. [1891] 297; *Patterson's Appeal,* 118 Pa. St. 571; *White v. Glover,* 59 Ill. 459; *Gibson v. Gains* (Ky.) 28 S. W. 781; *Hackett v. Hackett,* 67 N. H. 424; *Duval's Appeal,* 38 Pa. St. 112; *Mansfield v. District Agr. Asso.* 154 Cal. 145, 97 Pac. 150; *Stitzer v. Whittaker,* 3 Neb. (Unof.) 414, 91 N. W. 713; *Lewis v. Welch,* 47 Minn. 193, 199; *Fleming v. McCutcheon,* 85 Minn. 152, 88 N. W. 433.

WINSLOW, C. J. The fundamental question in this case is the question as to the proper construction of the agreement of December 1, 1896. Is it an absolute conveyance in trust for the benefit of the creditors alone, or is there a trust also reserved in favor of the grantors in case the claims of creditors be fully paid and a surplus of property remain in the hands of the trustees? The question is by no means free from difficulty. There is no clause in the agreement expressly providing that in case there be a residuum of property it shall be returned to the grantors, but the argument of the plaintiffs is that such a provision is necessarily to be implied from other clauses, and this conclusion was reached by the referee in an able opinion which is returned with the record.

The argument in this behalf starts with the proposition that if a grant of property is made in trust for a specified purpose, when that purpose is fully accomplished and there is property remaining undisposed of it necessarily belongs to the grantor. Certain clauses in the agreement are there cited and relied upon as showing that the parties contemplated that there would be a residuum of property after all claims were paid which was to be returned to the grantors. The features of the trust agreement so relied upon are the following:

(1) the recitation that the grantors have "ample" property to pay their creditors if it be not sacrificed and if the business can be continued with free use of the property; (2) the statement that "the services of the trustees" form a part of the consideration for the transfer, the argument being that if the transfer be absolute and in trust for creditors only, then the trustees will perform no services for the grantors which could be any part of the consideration; (3) the direction that the business shall be continued until January 1, 1900, "unless the debts of the firm be sooner paid," indicating that it was contemplated that the business might be profitable enough to pay the debts, thus leaving the property intact and involving the absurdity of supposing that in such case the property was expected to go to the creditors also; (4) the fact that Alexander McMillan was given an annuity to continue apparently only during the closing out of the estate, and the creditors were at the same time given power to close out the estate within the first year, thus ending the annuity, it being argued that it is unreasonable to suppose that Alexander McMillan would consent to any such arrangement if there was to be no surplus to be returned to him when his annuity was thus ended; (5) the fact that in the certificate of acknowledgment the officer recites that there appeared before him the grantors, naming them, "to me well known to be the persons named in and who signed and executed the foregoing agreement for the appointment of W. W. Cargill, *John M. Holley,* and *E. C. Warner* as trustees *for the said parties and their creditors,*" it being argued that this is an express recognition of the fact that the trustees are trustees for the grantors as well as for their creditors.

On the other hand, the defendants, in support of their contention, rely upon the following features of the agreement: (1) that there is no express provision directing the return of any surplus to the grantors, or even recognizing the possibility of the existence of a surplus; (2) that the trustees are called

"trustees for the creditors" in the agreement, not trustees for all parties; (3) that the debts are absolutely discharged by the creditors, thus indicating that the creditors accepted the property not as collateral security but in payment of their debts; (4) that in the clause empowering the trustees to call a meeting of creditors prior to January 1, 1900, to consider what should be done, the words "realize and divide the estate" are used, indicating clearly that it was considered the estate of the creditors, to be divided among them if they chose, and not a fund to be applied in payment of debts and out of which there might be a balance to be returned to the grantors; (5) the books and accounts of the trustees were to be open at all times to the inspection of the creditors but not to the grantors.

It must be admitted that after all is said that may be said concerning the various provisions of the agreement, the fact that the parties made absolutely no provision for the return of a surplus to the grantors in an agreement which quite elaborately provided for all other contingencies is very difficult to explain upon the hypothesis that they contemplated that there would be a surplus to be returned. The most that can be said in appellants' favor from the wording of the various provisions of the agreement, taken in connection with the entire absence of any special provision for the return of any surplus, is that it seems doubtful upon the face of the paper what the intent of the grantors was in this regard.

If this be the situation, then a case is presented where it becomes proper and even necessary to consider the facts and circumstances surrounding the parties at the time of the execution of the agreement in order to arrive at its proper construction. Some very important testimony along this line was received by the referee, and was rightly considered of great significance by the circuit judge in the very helpful opinion which he filed when deciding the case.

Mr. G. M. Woodward of La Crosse was a creditor of Mc-

Millan & Sons to the amount of $4,000, and when the firm was in financial straits in November, 1896, D. D. McMillan and his son, *John McMillan,* consulted Mr. Woodward as to the best arrangement to be made to prevent sacrifice of the property, and get it in shape so that creditors might be paid. Mr. Woodward testifies as follows:

"D. D. McMillan and I never talked about what would be done in case there was a surplus, over and above the amount of the debts.    We agreed if there should be an assignment for the benefit of the creditors and the estate should be closed out in that way probably the creditors would not get more than twenty or twenty-five cents on the dollar.    He expected if they would take time enough the property might pay the debts.    He and I discussed that somewhat, but I never could see more than fifty or sixty cents in it.    D. D. McMillan came in and proposed this paper to me.    He suggested the outline, and asked me to look up and see what forms there were that might be used.    I took Jones on Conveyances, and a form, I think on page 276, seemed to be the one that would be easiest adapted to the purposes of this trust.    That contained the express provision that after the payment of the debts, the surplus, if any, should be returned to the grantors. That was left out of this paper because there was no idea, no thought for a moment that there would ever be anything coming to the grantors.    I was satisfied it never would pay and he barely convinced himself that it might pay, so that was left out.    The only question was for the creditors that they might get as much as possible out of it, and that the McMillans should be discharged and free from their obligations.    November 11th I wrote out a draft of this agreement with a pen. I didn't have it typewritten, because we wanted to keep it a secret.    I mailed it to D. D. McMillan.    The first draft of this agreement provided for W. W. Cargill as sole trustee. This was handed to D. D. McMillan.    Sometime afterward he came back and said they wanted three trustees.    He named *Mr. Holley* and *Mr. Warner,* in addition.    This agreement was rewritten, putting *Holley,* Cargill and *Warner* as the trustees, and D. D. McMillan went off with it.    I don't think any other changes were made.

"He brought it to me subsequently after it had been signed by a number of others. I signed it. I don't remember what date. I understand all the creditors signed it except Leonard Lottridge, who was left out by some oversight. He had a $500 claim against Alexander McMillan, and threatened to garnishee the trustees. He came in by an oral agreement with the trustees. I do not know of any agreement to pay back the surplus in case there was one after the payment of the debts. I only talked with D. D. McMillan."

Reference to Jones' Forms in Conveyancing (2d ed.) pp. 276–279, will show that a part of the form there found contains an express provision of reverter, and that a substantial part of the form was used by Mr. Woodward in the preparation of the agreement in question, but that the reverter provision was not incorporated. This testimony is certainly of much weight and seems to indicate very clearly that the reverter clause was purposely excluded. Mr. Woodward, however, did not see Alexander McMillan, who owned the real estate in question here and whose representatives are bringing this action, and it is quite evident that the testimony quoted has considerably less weight as against Alexander and his representatives. Here, however, another very significant fact develops, and that is that the matter of a reverter was in the minds of Alexander, D. D., *John,* and *Sam McMillan* (the plaintiff) before the execution of the present agreement, and was the subject of discussion with Mr. A. E. Bleekman of La Crosse, who was the legal adviser of Alexander.

This is demonstrated by the testimony of *Sam McMillan,* himself one of the plaintiffs and son of Alexander McMillan. He identified a written memorandum entitled "Outline of Plan of Appointment of Trustee," which was shown to be in the handwriting of *John McMillan* and which he saw in his father's office before the execution of the present agreement. This memorandum provided as follows: (1) All property of Alexander McMillan, D. D. McMillan, and the firm, except exemptions, to be transferred to trustee to manage for the

mutual benefit of all concerned; (2) the idea is to prevent sacrifice of property, pay debts as rapidly as possible, with the idea of such reorganization of the affairs of each as may be possible and satisfactory; (3) creditors to agree to extend time until expiration of trusteeship and consent that trustee may run the business as before; (4) trustee to allow Alexander a proper and sufficient income to be agreed on later; (5) at the expiration of trusteeship all remaining property to be retransferred to Alexander and D. D. McMillan, according to original ownership. *Sam McMillan* further testified that he conversed with his father, Alexander, and with his uncle, D. D. McMillan, about the paper at the time, that they told him it was a general plan, and that they handed it to him and he took it to Mr. Bleekman and asked him what he thought about it.

It will be noticed that the agreement outlined in this memorandum is radically different from the agreement finally made. It contemplated simply a temporary placing of the business in the hands of a trustee, with merely an extension of time for the payment of debts and an ultimate return of the remaining property intact to the grantors. Now it appears that the agreement finally made was considered for some weeks after the first draft and evidently in connection with the memorandum just referred to, but it differed from the memorandum in many ways and in no way more significantly than in its absolute silence as to any retransfer of property at the close of the trusteeship. We cannot escape the conclusion that the omission was deliberate rather than accidental, and that it means that all the grantors had abandoned hope of saving anything out of the wreck and were content to absolutely transfer their property to their creditors in consideration of a release from their overwhelming load of debt. The widespread depression in business at the time of the transfer and for some years thereafter tends to make this conclusion more reasonable, as well as the fact that as late as 1900, when the

trustees attempted to dispose of the real estate, they found no market for it and were practically compelled to take it themselves rather than allow it to be sacrificed. It is common knowledge that real-estate values have advanced much since that time, and it may well be that in the light of present-day values it may seem that the creditors made a good bargain, but the matter must be viewed as it presented itself to the minds of the parties in 1896 and in the light of the business conditions and property values then prevailing.

The conclusion which we reach is that the circuit court was right in holding that no trust for the benefit of the grantors was reserved in the assigned property by the agreement under consideration. Upon this question authorities are of little assistance. It was entirely competent for the grantors and their creditors to agree that the property should be absolutely transferred to the trustees in consideration of a release of indebtedness, and it was competent for them to agree that it should be transferred subject to a reversion of the residue after the creditors had received the amount of their claims. The question as to which plan was adopted depends entirely on the language used in the agreement when given its proper construction, and upon this question decided cases give us no help, because no case has presented this agreement executed under like circumstances. The English case of *Cooke v. Smith,* L. R. 45 Ch. Div. 38, and 1 App. Cas. [1891] 297, approaches the nearest to the present case of the cases cited to our attention, but we have not considered it as at all controlling. Upon the language of the agreement here, construed in the light of the circumstances, we are entirely satisfied that no reverter was intended, and hence the defendants were not trustees for the grantors, and not subject to render any account to them for their acts.

*By the Court.*—Judgment affirmed.